Olmsted v. Proprietors of the Morris Aqueduct.

HENRY M. OLMSTED, PLAINTIFF IN ERROR, v. THE PROPRIETORS OF THE MORRIS AQUEDUCT ET AL., DEFENDANTS IN ERROR.

1. The Morris Aqueduct Company, under the legislation applicable to it, has the right to supply consumers outside of the corporate limits of the town with water.

2. By the act of 1876, it has authority to take by condemnation such lands and waters as may be necessary for its purposes, and is not compelled, first, to exhaust the territory embraced in the act of 1862.

3. The word "necessary" is used in its more restricted sense. In a matter of such extreme necessity, all contingencies must be provided for, and the supply should be so ample that a lack of water could not be reasonably apprehended. A supply to that extent is necessary to enable the company to perform its duty to consumers.

4. The courts must determine whether the use is of a public nature. If it is, the legislative authority over the subject of eminent domain, the circumstances under which, and the extent to which it shall be excercised, cannot be supervised by judicial inquiry.

5. The supplying of pure water by an aqueduct company is a measure of public utility, for which there may be an appropriation of private property under the power of eminent domain.

6. Although the aqueduct charter contains no express provision requiring the company to supply all consumers, the presumption of law is that the legislature intended to act within constitutional limits, and that the grant to the company was for the purpose of providing for the public necessity and convenience. In accepting such charter the company impliedly engages to use it in a manner that will accomplish the legislative design. It is thereby bound to supply on reasonable terms all who apply for water. The case of *Paterson Gas Company* v. *Brady*, 3 *Dutcher* 245, disapproved.

In error to the Supreme Court. For opinion of the Supreme Court, see 17 *Vroom* 495.

For the plaintiff in error, *S. H. Little*, (with whom was *Theodore Little*.)

The Proprietors of the Morris Aqueduct, in the month of June last, made an application to Justice Magie for the appointment of commissioners to assess the damages which will be sustained by the plaintiff by the taking and diverting from

his farm and mill of the waters of the Sand spring and Bailey brook. The commissioners were appointed, and the order appointing them was subsequently reviewed by the Supreme Court, upon *certiorari*, and confirmed. The plaintiff now seeks, by writ of error, to have that judgment of the Supreme Court reversed. He contends that the proposed taking is neither necessary nor proper, for the following reasons :

I. The proprietors can exercise the right of eminent domain only so far as is necessary and proper in order to supply Morristown with water.

The preamble to their charter, which was passed November 16th, 1799, states the purpose for which the corporation was created in these words : " Whereas, a number of the inhabitants of Morristown have associated together for the purpose of supplying themselves and their neighbors with water," &c. The first section of the supplement to their charter, approved February 17th, 1862, expressly recognizes and more definitely states this purpose by granting power to said proprietors " to add to and enlarge their present works, and to increase their facilities for furnishing water to the village of Morristown to such extent and in such manner as may be deemed necessary and proper," &c. This supplement is the only authority expressly given to this company to acquire property by condemnation, and under it they can take water only for Morristown. The terms " Morristown " and " town of Morris," in section 3 of the charter, and " village of Morristown," in section 1 of the supplement above mentioned, all refer to the same territory, and distinguish it from the " township of Morris," which is referred to in section 2 of the supplement passed March 14th, 1832.

The limits of Morristown are accurately defined by an act for its incorporation, approved April 6th, 1865. *Pamph. L.*, *p.* 819.

The counsel for the proprietors insisted, in the brief which he submitted to the Supreme Court, that they could entirely disregard the corporate limits of Morristown, because when

their charter was granted and the supplements thereto were passed, those limits had not been fixed by law, and were somewhat indefinite. But Morristown has been constantly growing, and it is undoubtedly true that the territory embraced within the corporate limits is of greater extent than the space properly denoted by the name "Morristown" in the year 1799. There is no ground for a presumption that their charter granted to them a wider field than that embraced within the present corporate limits of Morristown. Besides, these proprietors, in their petition upon which this case is founded, allege that they deem it necessary and that they have determined to add to their present works, and "thereby increase their facilities for furnishing water to the city of Morristown." And in this petition they claim the right to take the water in question by virtue of the supplement to their charter passed in 1862, and of an act passed in 1876, which is entitled "An act for the construction, maintenance and operation of water-works for the purpose of supplying cities, towns and villages of this state with water." The fifteenth section of this act, which is the section upon which this company relies, limits its right of condemnation "to such extent as may be necessary to carry out the purposes of its corporation."

I insist that these proprietors have admitted that they have express authority to take water for use only within the corporate limits of Morristown.

II. Their right to condemn for any other purposes will not be implied. "The act authorizing condemnation must be express and clear. If there are doubts as to the extent of the power, after all reasonable intendments in its favor, the doubts should be resolved by a decision adverse to the claim of power. Although a corporation may be engaged on a great public work, in which the power of condemnation would be of great service, yet the authority must be clearly conferred, otherwise the corporation must purchase from the owners as best they can." *Mills on Em. Dom.*, § 48 ; *Morawetz on Priv. Corp.*,

§ 153; *Doughty* v. *Somerville and Easton R. R. Co.*, 1 *Zab.* 443; *Morris and Essex R. R. Co.* v. *Newark*, 2 *Stockt.* 352.

In the case of *Miami Coal Co.* v. *Wigton*, 19 *Ohio* 565, the corporation was created under a general act passed April 8th, 1856, as a supplement to an act passed May 1st, 1852, to provide for the creation and regulation of incorporated companies in the State of Ohio. The act of 1856 authorized the formation of companies for mining coal, ores and other minerals, and also the carrying on of business usually connected with the main object of the corporations. It also provided that such corporations should have all the privileges, immunities and powers conferred upon manufacturing companies by the act of 1852 and the acts supplementary thereto.

The third section of the act of 1856 provided that companies organized for the purpose of mining should be authorized to construct a railroad, with such side tracks, offices, &c., as they deemed necessary for the purposes of their incorporation, from such mine to any other railroad; " and shall, in respect to such railroad, be subject to and governed by the act aforesaid, and the said supplementary, amendatory and other acts in relation to railroads, so far as applicable thereto."

The act of 1852 provides, " in relation to railroads," that " such corporation is authorized to enter upon any land for the purpose of examining and surveying its railroad line, and may appropriate so much thereof as may be deemed necessary for its railroad," &c.

It was held that a mining company, organized under the law of 1856, was authorized to build a railroad—that in re-respect to such railroad it would be governed by the acts in relation to railroads. But the court said: " There is no express grant of authority to condemn land in the clause, nor does it expressly confer upon such corporations the powers and privileges granted by law to railroad corporations. The grant of the power in question can only be inferred from the language of the last clause of the third section of the act of 1856. But this power cannot be derived by intendment or inference. *Cooley Const. Lim.* 530.

The rule which requires a strict construction of statutes authorizing condemnation is well established, and the case above cited shows how rigidly it is applied.

But in the present case it is insisted by the proprietors that the supplement to the act of April 21st, 1876, which was passed March 22d, 1883, (*Pamph. L., p.* 201,) providing "that it shall and may be lawful for any aqueduct or water company, organized under the act to which this is a supplement, or specially chartered for the purpose of supplying any city, borough or town with water, to extend its mains outside and beyond the corporate limits of such city, borough or town, along any road or street leading therefrom, for the purpose of supplying the dwellers along such road or street with water, provided a majority in frontage of the owners of land fronting on such road or street, or of any portion thereof, proposed to be supplied, shall consent thereto in writing," gives them the authority to take water for the use of persons living outside of Morristown. But I respectfully insist that no such authority can be derived from this statute. Is there any clause in it which expressly and clearly authorizes the condemnation of property of any kind ? Does it contain any reference to the taking of water ? If the legislature intended to confer such power, why did it not say so, or try to say so ? Perhaps the president of the proprietors, who drew this act, originally incorporated such a clause in it, which the legislature would not sanction. Certainly the language of the act does not contradict such supposition.

In the case of Miami Coal Co. *v.* Wigton, above cited, the court held that the company were expressly authorized to build and operate a railroad, but that the power to take lands for that purpose by condemnation was not expressly given, and would not be implied. So, full effect can be given to this act of 1883 by holding that though the proprietors may be authorized to extend their mains outside of the corporate limits and to supply non-residents with water, if they have sufficient, yet that the authority to take water for that purpose, not being expressly given, will not be implied.

If these proprietors desire to use the water of the Sand spring and Bailey brook for their own profit, by supplying persons with water who live outside the corporate limits of Morristown, they must purchase this water from the owners as best they can.

III. There is no present necessity for a further water supply for Morristown.

Whether or not there is such necessity is a matter of fact to be decided by an appropriate tribunal. The legislature has not constituted this company such tribunal. It should not be judge in its own case. The company's charter and the law of 1876, (*Rev., p.* 1365,) under which this application is made, allow a Supreme Court justice, upon application to him by the company, to appoint commissioners to assess damages. If the land-owner disputes the facts upon which the application is based, these disputed facts must be determined by the Supreme Court. And the whole case is now before this court for its consideration. *Hudson Tunnel Co.* ads. *Morris and. Essex R. R. Co.*, 9 *Vroom* 549 ; *Pamph. L.* 1881, *p.* 34, "*Certiorari.*"

The present New York doctrine is that the court is to determine, upon the application by a railroad company to acquire lands, the question of the necessity and extent of the appropriation, and that the land-owner may contest the question. The burden is on the company to show the necessity. *Mills on Eminent Domain*, §§ 11, 58 ; *Green's Brice's Ultra Vires* 388 ; *Matter of N. Y. Cent. R. R.*, 66 *N. Y.* 407 ; *Van Rensselaer and Saratoga R. R. Co.* v. *Davis*, 43 *N. Y.* 137 ; *Jersey City* v. *Montclair R. R. Co.*, 6 *Vroom* 329 ; *Camden and Amboy R. R. Co.* v. *Woodruff*, 7 *Vroom* 95. It must be a present necessity for more water. *Gregory* v. *Mayor and Aldermen of Jersey City* 7 *Vroom* 166.

The plaintiff has been obliged to rely upon the officers and agents of the defendant for a statement of the facts in this cause. The case almost wholly depends upon the evidence of a single witness, and he is bound to the interest of the de-

fendant by triple bonds : he is one of the proprietors, he is the president of the corporation and their counsel in this cause. On the other hand, the defendants have relied upon him to state their case under oath, and in such a manner as to lead this court to believe that it is necessary for them to take more water.

I insist that these proprietors are not authorized to take the plaintiff's water by condemnation, in order to escape the inconvenience to themselves, incident to securing a constant and adequate supply by storage and pumping. There must be an actual necessity to justify their exercise of the power of eminent domain. *Inhabitants of Greenwich* v. *Easton & Amboy R. R. Co.*, 9 *C. E. Green* 217 ; *S. C.*, 10 *C. E. Green* 566 ; *Central R. R. Co.* v. *Hudson Terminal Co.*, 17 *Vroom* 292.

Do these proprietors show an inconvenience which this court will determine is equivalent to a necessity, and brings their case within the rule ?

IV. If there is need of more water for Morristown, then said proprietors are required first to take the water of springs and streams westward of Morristown, and between the direct road from Morristown to Mendham, and the direct road from Morristown to Baskingridge.

The supplement to the charter of the proprietors, approved February 17th, 1862, which contains the only provision conferring expressly upon this company the right of eminent domain, limited the exercise of that right to this territory.

The Sand spring and stream are entirely outside of the limits above mentioned, and there is abundance of water within these limits. Trout brook, a stream from Jockey Hollow proper, Primrose brook, besides the Mills Bailey stream in question, are all within the boundaries above mentioned, and are all suitable for a water supply, or can readily be made so.

The general act of April 21st, 1876, (*Rev., p.* 1368,) does not expressly nor impliedly repeal any portion of the charter of these proprietors, nor any of the supplements

thereto.    There is nothing in the terms of the general act which is irreconcilable with the limitations imposed upon this company by the supplement of February 17th, 1862.    These two laws can be readily construed together.    It is the duty of the court to so construe them that both shall have effect. *Sedgw. on Stat. Const.* 200, 210 ; *Ruckman* v. *Ransom,* 6 *Vroom* 565 ; *Naylor* v. *Field,* 5 *Dutcher* 287.

The supplement of 1862, which conferred upon this company the right to take water by condemnation, threw a cloud upon the title of every man owning land within the territory defined.    For more than twenty years people have bought and sold land with notice of that cloud.    The reason for the restriction is certainly as strong to-day as when the act was passed.    Ought every land-owner in the vicinity of Morristown, upon whose land there is a spring or stream of water, to have his title changed to a qualified or base fee before this company has exhausted the sources of water supply in the territory originally assigned to it ?    Until the proprietors do this, so far as this company is concerned, the necessity which is contemplated by section 15 of the act of 1876 does not exist.

V. This application is not made in good faith.

The learned judge who delivered the opinion of the Supreme Court says : " That the application for the appointment of commissioners is made in good faith is proved by the fact that the Proprietors of the Morris Aqueduct have already expended a large sum of money in purchasing and laying pipe preparatory to acquiring the right to divert the waters applied for, as well as by the fact that large expense must follow the condemnation."    But I respectfully insist that the action of these proprietors in laying their pipe to the Sand spring and Bailey brook before making application for the appointment of commissioners—before they knew whether there would be any opposition by persons interested, or the grounds of their opposition—examined in the light of the facts which the evi-

dence of their president has disclosed, does not necessarily even tend to prove their good faith.

That action of these proprietors is entirely consistent with bad faith. They seek to take the plaintiff's water on the ground that there is a scarcity for Morristown. It has been demonstrated that an abundance of water is furnished by the present sources of supply for all the wants of Morristown, but that the storage capacity of the proprietors is very deficient. They have adroitly urged the apparent scarcity, occasioned wholly by insufficient storage, by their wastefulness in the use of water, as a reason for taking a further supply.

I insist that it is evident that these proprietors intend to use the water of the Sand spring and Bailey brook for other purposes than the supply of Morristown. The facts cannot be explained on any other theory.

"It is a well-settled head of equity that any company authorized by the legislature to take compulsorily the land of another for a definite purpose, will, if attempting to take it for any other object, be restrained by the injunction of the Court of Chancery from so doing." *Green's Brice's Ultra Vires* 376; *Simpson* v. *South Staffordshire Water Works*, 4 *De G., J. & S.* 679; *Mayor of Cardiff* v. *Cardiff Water Works Co.*, 5 *Jur.* (*N. S.*) 953; *Kane* v. *Mayor, &c., of Baltimore*, 15 *Md.* 24.

For the defendants in error, *Henry C. Pitney, Jr.*, (with whom was *Alfred Mills.*)

I. The acts under which these proceedings are taken are constitutional.

The charter and all the other acts in question proclaim a public use. As to what constitutes a public use, see *Mills on Eminent Domain, pp.* 15, 16, §§ 12, 13; *pp.* 20, 21, § 18.

The supply of a large number of inhabitants with water is a public purpose, and is not the less so because the legislature has not seen fit to impose certain regulations as to the mode and extent of the supply.

That no limit is fixed by the legislature to the rates assessed by the water company; or that there is no express provision

requiring the company to supply all persons on reasonable terms; or that the company may act capriciously or oppressively—does not make the acts unconstitutional. An abuse of its powers by the company may be ground for indictment or for revoking its charter, but is no objection upon constitutional grounds. *Lombard* v. *Stearns*, 4 *Cush.* 60.

II. *First.* It is the province of the legislature to determine the necessity and propriety of a taking for a public use and the extent to which the power shall be exercised. *Tide-water Co.* v. *Coster*, 3 *C. E. Green* 54, 518; *Talbot* v. *Hudson*, 16 *Gray* 417; *People* v. *Smith*, 21 *N. Y.* 595.

When the use is a public one, the legislative authority cannot be restrained or supervised by the courts. *Pittsburg* v. *Scott*, 1 *Penna. St.* 309; *Mills on Eminent Domain, pp.* 12, 13, §§ 10, 11.

The legislature, by the charter and supplements, has delegated to this corporation the function of judging the necessity and propriety of the taking and the extent to which the power of taking shall be exercised.

The supplement of 1862, section 1, page 6 of pamphlet, says:

"It shall and may be lawful for the said corporation * * * to increase their facilities * * * to such extent and in such manner as may be deemed necessary and proper." * * *

And section 3, page 6 of pamphlet, says:

"That in case the said corporation cannot agree with the owner or owners or other persons interested in any lands which said corporation may desire to use and occupy, or from which they may desire to take or divert, either in whole or in part, any spring or springs, stream or streams, for the purpose aforesaid, as to the amount of compensation to be paid," &c., then commissioners shall be appointed, &c.

The act of February 17th, 1881, (*Pamph. L., p.* 34,) does not authorize or require the court to inquire into and pass upon the necessity or propriety of the acquisition sought by

these proceedings, provided it appears that they are taken in good faith and are not an abuse of power. To go beyond that point would open to the court an endless field of inquiry and hamper by its supervision all public enterprises in the state. The legislature cannot have so intended.

No want of good faith or abuse of power is manifested with regard to these proceedings. In the narrowest view of the evidence, they but nearly anticipate the prospective growth of the town, which is large and promising. The aqueduct company should not be arrested in proceedings which are intended to provide for the future wants of the town as well as to supply its immediate necessities.

An intention to supply a class of persons outside of the corporate limits, under pretence of taking water for the use of the town, is distinctly disavowed by the company, and is unsustained by any evidence. *Errington* v. *Metropolitan District Railway, L. R.,* 19 *Ch. Div.* 559–579 ; (*Jessel, M. R., p.* 570 ; *Brett, L. J., p.* 576.)

*Second.* But if the necessity and propriety of the taking must now be reviewed, then we must look to the evidence.

It is said, without contradiction, that the proposed increase " is necessary to enable us to be sure to have a supply for the town of Morristown ;" that is, that the waters now to be condemned are necessary in the sense in which that word is used—needful, suitable—in providing pure water for the growing wants of the town. Even if these waters are not indispensable within a definite period—say, of five years— still the undisputed testimony is that the town is growing and the number of water-takers is increasing, and there is a present necessity of providing for future contingencies. Such providence is one of the positive duties of this company, which has assumed the burden of this enterprise. As it is not denied that within a short period these waters may become indispensable, it is not the duty of the court to interfere and prohibit the present taking.

The court will not, unless for special reasons shown, inter-

fere with the judgment of the proprietors in their choice of waters within their territory.

If they are authorized to go outside of their original territory, as fixed by the supplement of 1862, they may take the best waters wherever they may find them.

It will be presumed that the company will seek its new supplies at the most convenient sources and will take such waters as may be the best for its purposes, and the cheapest both in the cost of acquisition and in the cost of transportation.

The president says that the proposed increase "is necessary to enable us to have a supply of water."

He compares the quality of the Sand spring with that of other streams mentioned.

And says that "there is no road-wash or cultivated field-wash in the Sand spring."

"The Sand spring is so situated that it is practically easy to protect it from impurity."

As to the Pierson trout brook, he says of the water-shed which supplies that stream, that "the difficulty is, there are cultivated fields in it, and the principal source of it runs through a man's cow-yard; that is what frightened me out of it."

And as to the water running into the Guerin stream below the present point of diversion, he says that it runs "through Mr. Foster's land near his barn-yard," and that an attempt to use it gave rise to complaint.

And of the William Day spring, and the surplus waters now under the control of the company, all of which flow into the company's grist-mill pond, that they are not, "in my judgment, fit to use by reason of their liability to be fouled by the vicinity of human habitation, cultivated land and wandering cattle."

And of the Primrose brook—four miles from the town—he says: "There are cultivated fields and roads crossing it, and altogether the problem of making it pure would be a very serious and expensive one; I have looked at it very carefully."

As to the quantity of the several streams and the cost of carrying them to the town, he says that to utilize waters by means of both storing and pumping would greatly increase the expense; but that, although the "Sand spring must be pumped, it has other advantages which make it cheaper and better for the company to use that than to go further at much greater expense to get gravity water."

"Notwithstanding the great expense attending pumping, in my judgment, it is cheaper to pump that spring than to go farther and buy up one hundred acres of land in order to have pure water at the source of a gravity stream."

The quantity of the Sayre brook is insignificant—"one-tenth as large as the Pierson stream; it crosses the road about three miles from Morristown."

The waters of the present supply are practically exhausted; and none of the surplus can be stored below the present points of diversion, except at points from which it must be utilized with the additional expense of pumping, except a small part of the Western avenue or original gravity water.

To bring in the Primrose brook—four miles from the town —would be very expensive.

*Third.* The necessity spoken of in the supplement of 1862 and in the act of 1876 (*Rev., p.* 1368, § 15,) is not an absolute necessity, in the sense that the waters to be taken shall be indispensable to the purposes of the corporation. The word "necessary" cannot be rigidly and narrowly construed, but may often be interpreted as "needful," "essential," "suitable," "useful" or "convenient." See the discussion of Chief Justice Beasley, and quotation, in *State, Railroad Co., pros.,* v. *Hancock, Collector,* 6 *Vroom* 537, 545; *McCulloch v. State of Maryland,* 4 *Wheat.* 415.

The conjunction of the words "necessary" and "proper" cannot be made to contrast the terms, but must assimilate the former to the latter in meaning—otherwise the latter becomes superfluous. The contents of the term "proper" must include those of the term "necessary," but if the term "necessary" in its rigid sense be paramount in the clause, it robs

the term "proper" of all force and effect, and excludes all things "suitable," "essential," "useful" or "convenient" except such are "indispensable."

The term "necessary" often means no more than "useful, needful, requisite, incidental or conducive to." It is in this sense the word appears to have been used when connected with the word "proper." *Story on Const.*, §§ 1243, 1248 ; *Montague* v. *Richardson*, 24 *Conn.* 347.

The same construction must be made of the word "necessary" in the act of 1876. *Rev.*, *p.* 1368, § 15.

III. The aqueduct company is not required to seek its supply first in its original territory—that is, within the limits mentioned in section 1 of the supplement of 1862, pamphlet, page 6, before resorting to other sources.

This question, of course, only affects the proceedings so far as it relates to the Sand spring—the Bailey stream being wholly within the limits mentioned.

None of the acts contains a direction requiring the company first to exhaust the springs found in any single valley.

On the contrary, the language of the charter is general, authorizing the proprietors to purchase, take and hold "all such lands, &c., as shall be necessary and convenient to them in the prosecution of their works."

The supplement of 1862 allows the proprietors to exercise some discretion in enlarging their works and increasing their facilities "to such extent and in such manner as may be deemed necessary and 'proper,' and in acquiring any lands from which they may desire to take or divert" water.

The act of 1876 (*Rev.*, *pp.* 1365, 1368, § 15,) removes all limit to the territory in which this company may seek its waters.

The construction of the term "necessary" as "needful" or "suitable" is in conformity with the language and spirit of these acts in designating the waters which may be taken, and the territory in which they may be sought.

No intention can be gathered from these acts to restrict the

taking of waters, either as to direction or extent, except as it shall be necessary or proper or convenient.

The object of the act of 1876 was to give water companies their choice among the different supplies within their reach, to enable them to take the best and cheapest water wherever they can find it.

IV. It does not appear that the proprietors have extended their pipes outside the limits of Morristown, nor that they intend to use the prosecutor's water to supply persons living outside of the town.

*First.* The original charter of 1799 and the supplement of 1862 were both passed before the act incorporating Morristown (1865), so that the "village of Morristown" cannot be circumscribed by any mere artificial lines afterwards fixed by the legislature for mere corporate purposes.

All points reached by the water-mains are within the growth and extension of Morristown as a community. Even the "Newark Settlement" near the Convent station, mentioned in connection with the "negotiations" discussed in the testimony, is an appendage or extension of the community of Morristown.

The evidence shows, however, that the water is now needed for use within the corporate limits, and that the extent to which the mains have been laid and water furnished outside of the corporate limits is so trifling as to be unworthy of notice.

*Second.* The act of March 23d, 1883, (*Pamph. L., p.* 201,) authorizes the company to extend its mains beyond the corporate limits of the town along any road or street leading therefrom for the purpose of supplying the dwellers along such road or street with water; and, of course, to condemn water for that purpose.

*Third.* But the company disavows the present intention of going out of the corporate limits, and avers that the water is needed for use within the limits of the town.

The opinion of the court was delivered by

VAN SYCKEL, J. The questions involved in this case arise under an application made by the Proprietors of the Morris Aqueduct for the appointment of commissioners to condemn for their uses all the waters of a certain spring called Sand spring, and a certain specified portion of the waters of Mills Bailey brook.

The appointment of commissioners was certified into the Supreme Court, and there held to be legal. The reasons relied upon by the plaintiff in error for setting aside the appointment of commissioners, which were unsuccessfully urged in the court below, are the following:

First, because the Proprietors of the Morris Aqueduct can exercise the power of eminent domain only so far as is necessary to supply Morristown with water.

Second, because, if there be need of more water, they are required by law first to take the springs and streams having origin or running or being to the westward of Morristown and between the road from Morristown to Baskingridge and the road from Morristown to Mendham; and that the water which they seek to divert is not within such territory.

Third, because said Proprietors of the Morris Aqueduct have extended their water-pipes outside of Morristown and supply persons living outside.

Fourth, because the law under which they have proceeded is not constitutional.

The original act of incorporation, passed November 16th, 1799, gives the company no power to acquire land or water-rights by condemnation. By a supplement, passed in February, 1862, authority was granted at all times thereafter to add to and enlarge their works, and to increase their facilities for furnishing water to the village of Morristown to such extent and in such manner as may be deemed necessary and proper, and for that purpose to take and divert any spring or springs, stream or streams of water having their origin, running or being to the westward of the village of Morristown and between the direct road leading from Morristown to Basking-

ridge and the direct road or turnpike leading from Morristown to Mendham, and to lay down, maintain and repair pipes, &c. *Pamph. L.* 1862, *p.* 30.

By the third section of the act, power is given to a judge of the Morris Pleas to appoint commissioners to assess damages where the land-owner and water company fail to agree.

In 1876 a general law was passed providing for the construction, maintenance and operation of water works, by the fifteenth section of which it is provided " that any aqueduct company now in existence under any special charter in this state shall have the right from time to time to add to and extend their works to such extent as may be necessary to carry out the purposes of its corporation, and for that purpose to take all such lands and divert all such streams of water in the manner hereinbefore provided, as shall be necessary for that purpose." · *Pamph. L.* 1876, *p.* 323 ; *Rev., p.* 1364.

The fifth section of this act requires the application for the appointment of commissioners to be made to a justice of the Supreme Court.

On the 23d of March, 1883, an act was passed making it lawful for any aqueduct or water company, organized under the general law or specially chartered for the purpose of supplying any city, borough or town with water, to extend its mains outside and beyond the corporate limits of such city, borough or town, along any road or street leading therefrom, for the purpose of supplying the dwellers along such road or street with water.

The interpretation and effect which, in my judgment, must be given to these several acts of legislation will be briefly stated.

The act incorporating Morristown was passed in 1865. Therefore the area included by the term " village of Morristown," as used in the act of 1862, supplementing the water company charter, cannot be circumscribed by the artificial lines afterwards fixed by law for the purpose of erecting a municipal government for Morristown. The act of 1865 had no relation to the water charter. The words " village of Morristown," in the act of 1862, must be construed as if the

act of 1865 had not been passed.    In that view they have a
wider and broader meaning than the plaintiff ascribes to them.
It would be an exceedingly narrow reading of the act to say
that the constantly increasing area over which houses were
contiguously built was not comprehended by its provisions
and could not participate in its benefits.

The act of 1862 invests the aqueduct company with the
power to take lands within a prescribed area, for the purpose
of supplying the village of Morristown with water.

The fifteenth section of the act of 1876 is comprehensive in
its terms, applying to every aqueduct company then in ex-
istence under any special charter.    The legislature declared
that every such company should have the benefit of its pro-
visions.    To exclude the defendant company from its opera-
tion involves a disregard of the plain language of the act.
It clearly grants to the company the right to go outside the
area to which it was restricted by the act of 1862, and to take
all such streams of water as shall be necessary to carry out the
purposes of its incorporation.

By the act of 1883 the power is added to extend its mains
in certain roads and streets outside the limits of the town, for
the purpose of supplying water.    This act enlarges the pur-
poses of the company as declared in the act of 1862, so that
by force of the two acts it may supply Morristown and also
the designated localities outside of Morristown.    The act of
1876 applies to the company in its enlarged capacity, and
under the fifth section of that act all lands necessary for its
increased purposes may be taken by condemnation.    Whether
this power is wisely bestowed is a question which must be ad-
dressed to the law-maker.    The burden is on the company to
make it appear that it is necessary, within the meaning of this
legislation, to take the waters in question for its purposes.

In *McCulloch* v. *State of Maryland*, 4 *Wheat.* 414, Chief
Justice Marshall, in criticising the term " necessary," says :
" It does not always import an absolute physical necessity so
strong that one thing, to which another may be termed neces-
sary, cannot exist without that other.    If reference be had to

its use in the common affairs of the world, or in approved authors, we find it frequently imports no more than that one thing is convenient, or useful or essential to another. To employ the means necessary to an end is generally understood as employing any means calculated to produce the end, and not as being confined to those single means without which the end would be entirely unattainable."

In *State* v. *Hancock*, 6 *Vroom* 537, 546, this court said that this is the sense in which the word " necessary " is always used in clauses which confer upon incorporated companies the general authority which is to enable them to perform the function for which they are created.

It will be observed that the act of 1876 was passed after the word " necessary " had received this judicial construction, and therefore the more limited meaning must be ascribed to it. Is it therefore useful, needful and requisite, in order to create an ample water supply for the district that may draw upon it, that the company shall be permitted to appropriate the waters described in the application for commissioners ?

It is impossible to estimate with precision the quantity of water that will be needed to supply the wants of a population of about six thousand ; nor can it be computed with accuracy what the supply of water will be from the district hitherto relied upon. In a matter of such extreme necessity, all contingencies must be provided for, and the supply should be so ample that a lack of water could not be reasonably apprehended. A supply to that extent is necessary to enable the company to perform its duty to its consumers.

The evidence satisfies me that in the granting of this application the legislative authority has not been transcended.

This disposes of all the questions presented by the case except that as to the constitutionality of the acts in so far as they authorize the exercise of the power of eminent domain.

This turns upon the question whether the use for which condemnation is authorized is a public use. The courts must determine whether the use is of a public nature, but under what circumstances it is wise to exercise the power of eminent

domain is purely a matter for legislative discretion. *National Docks R. R. Co.* v. *Central R. R. Co.*, 5 *Stew. Eq.* 755, 764.

If the use is a public one the legislative authority over the subject, and the extent to which it shall exercise that authority, cannot be supervised by judicial inquiry. The use being of a public nature, it undoubtedly must rest, as Chancellor Kent says, in the wisdom of the legislature to determine when the public use requires the assumption of private property.

This I understand to be the declaration of this court in *Tide-water Company* v. *Coster*, 3 *C. E. Green* 518, where the Chief Justice cites with approbation the language of Chancellor Walworth, classifying among public uses the bringing of water to cities and villages.

In *Gardner* v. *Trustees of Newburgh*, 2 *Johns. Ch.* 161, the complainant asked for an injunction to restrain the trustees from diverting a watercourse for the purpose of supplying the village with water. In granting the injunction, Chancellor Kent put it upon the ground that compensation to the land-owner was not provided. He expressly stated that he was not to be understood as denying the competent power in the legislature to take private property for necessary or useful public purposes, and, perhaps, even for the purposes specified in the act on which the case before him arose.

In *Inhabitants of Wayland* v. *County Commissioners*, 4 *Gray* 500, land taken by a city, under legislative authority, for the purpose of supplying the city with pure water, was held to be justly taken in the exercise of the right of eminent domain.

But it is not necessary that the public should own the property taken. It may be owned by a private corporation, such as a railroad company, a canal company, or even by a private individual. Ownership and use are not synonymous. The constitution is satisfied if the use is public, and the public may have the privilege of using the same. *Mills on Eminent Domain*, § 13; *Bloodgood* v. *Mohawk Railroad*, 18 *Wend.* 9.

On the principle of public benefit, not only the state and its political subdivisions, but also individuals and corporate

bodies may lawfully be authorized to take private property for public purposes. The fact that members of an incorporation have a pecuniary interest, such as will give the corporation the character of a private enterprise, does not debar the state from using it to further the public welfare.

Upon this basis, Mr. Justice Cooley says, rests the right to charter companies for the construction of railroads and highways.

He further remarks that while it will not be safe to apply with much liberality the rule "that where the public interest can be in any way promoted by the taking of private property, the taking can be considered for a public use," the settled practice of free governments must be our guide in determining what is a public use, and that only can be regarded as such where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience or welfare, which, on account of their peculiar character, and the difficulty in making provision for them otherwise, it is both proper and usual for the government to provide.

He enumerates the supply of pure water among the measures of public utility for which there may be an appropriation of private property.

In *Lumbard* v. *Stearns*, 4 *Cush.* 60, Chief Justice Shaw declared that the use was public, where the legislative act incorporated an aqueduct company for the purpose of supplying a village with water with the right to take springs and lands for its purposes, although the charter contained no provision requiring the company to supply consumers.

The presumption is always in favor of the validity of legislative acts. If no obligation rested upon the water company to supply on reasonable terms all who apply for water, the use would be strictly private. The duty of furnishing the public with water must be present, to make it of a public character.

Although the legislative act may contain no express provision imposing such duty, the presumption is that the legis-

lature intended to act within constitutional limits by creating a public franchise, and that the grant to the company was for the purpose of providing for the public necessity and convenience.

The powers granted to the water company are unquestionably capable of being employed as a means of great public usefulness, and hence their creation was a legitimate act of legislation. An intention that they shall be used otherwise will not be imputed to the law-making power, nor will the grantee be permitted to pervert them to uses for which they could not lawfully be bestowed.

In accepting such a charter the company impliedly engages on its part to use it in such manner as will accomplish the object for which the legislature designed it. It cannot refuse to perform the public duties thus cast upon it, without surrendering the franchise. When an individual or a corporation is guilty of a breach of public duty by misfeasance or nonfeasance, the law provides a remedy.

The true criterion by which to judge of the character of the use is, whether the public may enjoy it of right, or by permission only. *Bonaparte* v. *Camden and Amboy R. R. Co.*, *Baldwin C. C.* 205.

Assuming, as we must, that the legislature intended to exercise its lawful power, and that the company, in invoking the benefit of the corporating act, took upon itself the correlative obligation to serve the public, it necessarily follows that the use is a public one. I agree with Mr. Justice Parker, who delivered the opinion in the court below, that if the supplying of a city or town with water is not a public purpose, it is difficult to conceive of any enterprise entrusted to a private corporation that could be classed under that head.

The supplement of 1880 to the act concerning telegraph companies contains no express words imposing the duty to send messages for all who apply. In *Turnpike Company* v. *News Company*, 14 *Vroom* 381, the Supreme Court maintained the constitutionality of the law as constituting a public use, on the ground that there must be an implication that in

granti¡ ¡the franchise, the legislature intended to charge the compr es with a duty to the public, and that in accepting the benef of the law, the recipient of them assumes the performa. of such public duty.

The case of *Paterson Gas Light Company* v. *Brady*, 3 *Dutcher* 245, is cited in support of the contrary contention. In that case Mr. Justice Elmer declared that the company was under no legal obligation to supply gas to all persons having buildings on the lines of their pipes, upon tender of reasonable compensation. He rested this view upon the absence of any express provision in the charter imposing such duty upon the company. This decision fails, however, to give due effect to the purpose of the legislature in creating the company, and to the implied obligation assumed by the company in accepting the grant. If it were a grant for mere private uses, empowering the corporate body to withhold service at pleasure from all persons, the company would be without the right to occupy the public streets for the laying of its pipes, and, of course, the grant of eminent domain for such private purposes would be void.

In this respect, in my judgment, the conclusion in the Paterson case was erroneous, and in conflict with the views expressed in the Tide-water case, and in National Docks v. Central Railroad Company.

The attention of the court has also been called to the fact that by a supplement passed in 1832 the aqueduct company was authorized " to establish and carry on any milling and manufacturing business that they may deem expedient." This, it is insisted, is a strictly private use for which condemnation cannot be lawfully resorted to.

The evidence shows that the supply of water is not appreciably diminished by the mill use, no more water passing the mill than would probably be wasted in maintaining the supply in the reservoir in a pure and wholesome condition. It cannot, therefore, be regarded as an illegal diversion of the water supply, and ought not to be considered in construing

the legislative scheme from which the defendant company derives the powers which it is now seeking to exercise.

In my opinion, the judgment below should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DEPUE, REED, SCUDDER, VAN SYCKEL, BROWN, CLEMENT, COLE, PATERSON, WHITAKER. 11.

*For reversal*—None.